SIOUX CITY & ST. PAUL RAILROAD COMPANY *vs.* GEORGE F. ROBINSON, County Auditor, and others.

### October 3, 1889.

**Railroad Companies—Taxation—Trust-Deeds.**—An instrument, known as the "Rice and Drake Trust-Deed," by which plaintiff conveyed a part of its land grant to trustees that the lands might be sold, and the proceeds devoted to the satisfaction of certain bonds issued at the same time and sold in open market, that funds might be obtained with which to build a portion of plaintiff's railway, construed in connection with such circumstances as appeared from the testimony, and under the rules established by this court in *St. Paul & S. C. R. Co.* v. *McDonald*, 34 Minn. 182. *Held*, that the transaction did not amount to a conveyance of the lands, and that they are not taxable under Laws 1865, c. 15, § 5.

Plaintiff brought this action in the district court for Cottonwood county, against the county auditor, treasurer, and board of commissioners, to restrain the assessment, levy, and enforcement of taxes against a large quantity of land in that county forming part of plaintiff's land grant. The action was tried by *Perkins*, J., who ordered judgment for defendants, on the grounds (1) that the execution and delivery of the trust-deed considered in the opinion constituted a sale and conveyance of all the lands embraced therein, within the meaning of Laws 1865, c. 15, § 5; and (2) that if the lands were not subject to ordinary taxation, still no case for equitable relief exists, since the plaintiff has an adequate remedy at law by answer and defence in the statutory action to enforce payment of the taxes. Plaintiff appeals from the judgment.

*Daniel Rohrer*, for appellant.

*Moses E. Clapp*, Attorney General, *T. J. Knox*, and *J. G. Redding*, for respondents.

COLLINS, J.    The lands involved in this litigation are among those granted by the general government in the year 1857, in trust to the then territory of Minnesota, to aid in the construction of a specified line of railway, and thereafter transferred to the plaintiff's predecessor, the St. Paul & Sioux City Railroad Company, in execution of the trust.    As originally held, and prior to a transaction which included the execution of an instrument styled a "trust-deed" by the plaintiff, these lands were wholly exempt from taxation.    In 1869 plaintiff, authorized so to do by chapter 50, Special Laws of that year, became the owner of the lands in question, a six-mile grant in the state of Minnesota.    It also held a ten-mile grant in the state of Iowa.    The railway which plaintiff and its predecessor had undertaken and were obliged to build in order to earn the lands embraced in these grants had not been fully built.    For the purpose of raising funds wherewith to complete the same, this plaintiff made its bonds for $500 each, in the aggregate sum of $2,800,000.    To secure the payment of the bonds, it executed the so-called "trust-deed," bearing date August 1, 1871, in which Alexander H. Rice and Elias F. Drake were named as trustees, whereby it conveyed to them, for the purpose above mentioned, all of its said granted lands in Minnesota and Iowa, supposed to be about 637,000 acres.    Of these acres, however, the court finds that it was not then expected, owing to conflicting claims, that the plaintiff would receive to exceed 550,000 acres.    Five hundred and thirty thousand have been obtained and made subject to the terms of the instrument executed to Rice and Drake, while 20,000 acres remain contingent and unconveyed.    The balance of the 637,000 acres was awarded to another company after tedious litigation.    All of the lands in this state have been disposed of by the trustees, except 62,619 acres and a quantity of town lots.    By reason of the execution of this trust-deed, the proper authorities claim that these lands have been conveyed, and therefore, as provided for in Laws 1865, *c.* 15, § 5, subject to taxation in the customary manner.    So believing, the defendant auditor has caused each parcel to be assessed, the county commissioners have levied taxes, which were about to be extended upon the tax duplicates for the year 1887, when this action was brought, the object being to restrain the de-

fendants auditor and treasurer from further proceeding in the matter. The form of the conveyance to the trustees and the surrounding circumstances are not the same, but the principal question to be discussed is that determined in *St. Paul & Sioux City R. Co.* v. *McDonald,* 34 Minn. 182, (25 N. W. Rep. 57,) and *Same* v. *Robinson,* 40 Minn. 360, (42 N. W. Rep. 79.) As was said, substantially, in the first-mentioned of these cases, the issue must be determined by construing the transaction, and considering its intent and purpose.

At the termination of the trial below the court found that when this trust was created and the bonds issued, it was not expected by any of the persons concerned that, after paying the bonds from the proceeds of the sales of land, there would or could be a residue of either lands or money to revert to plaintiff, and that it was the intention of the latter to transfer, and of the bondholders to acquire, the entire beneficial interest in the lands and all thereof, said plaintiff retaining nothing but the bare legal title and mere form of ownership, in trust for the holders of the bonds. The trial court therefore declared the lands taxable, as is other real property. It is this conclusion, with the finding upon which it was based, which is assailed upon this appeal.

The findings were reached, and their correctness must be passed upon here, by an examination of the various provisions of the deed, in connection with another finding as to the value of the lands at the time the deed was made, and as enhanced by the completion of the railway. There was no conflicting testimony as to the object in view and to be attained by the sale of the bonds, or as to the condition of the land, or as to the situation of the parties. The real purpose of those who devised this plan of raising funds with which to complete the enterprise, and the true character of the transaction, may be discovered, and is not necessarily or conclusively determined, by the legal terms placed in the instrument which has been executed. The court may examine and construe it in the light of the circumstances which surrounded its creation, and which may have attended it since, as these have been presented by the testimony. Here the purpose must be gathered almost exclusively from the trust-deed itself, and, with the doctrine in mind heretofore established by this court as

controlling in this class of cases, we are unable to agree with the trial court that in this transaction there was intended, or was in fact, an absolute alienation to the bondholders, or that it was not undisputed that there might be a surplus of cash or a residue of lands when all of the bonds issued had been redeemed. To come to this conclusion would be, in our opinion, to ignore and sweep away, without sufficient reasons and in the absence of any testimony which would justify such a step, the plain provisions of the conveyance in which Rice and Drake were named as trustees. A consideration of these provisions seems proper. By the terms of these bonds they were payable solely out of the proceeds of a sale of the lands described in the trust-deed. The plaintiff expressly disavowed any liability above the net proceeds of these sales, but covenanted to sell the lands and distribute these proceeds in accordance with the terms of the deed. The bonds were issued for sale, and were actually sold in open market, and to many persons who were not and had not been connected with the construction of the railway in any manner. It follows that when the trust-deed was executed the future purchasers of the bonds were unknown, and consequently not named. Any person could become a purchaser at the market price, which was about 60 cents on the dollar, and this right of purchase was unrestricted as to amount or individual. It was not nor could it have been known, when the plan was formulated and the bonds placed on the market, who the future purchasers might be, and therefore they were not consulted, nor did they have any voice in the matter. Any purpose upon their part to enter into a scheme whereby the government might be defrauded, and by which they would become the real owners of these lands although the legal title remained in plaintiff, could not have existed prior to the time that they bought the bonds in open market, as they would have purchased any other securities which seemed to promise a safe and remunerative investment. They were not buying lands but bonds, and in the transaction there was no opportunity offered through which all of the landed security could be appropriated in exchange for the bonds.

In this respect there is a marked difference between this transaction and that detailed in the recent case of *St. Paul & Sioux City R.*

*Co.* v. *Robinson, supra.* The trust-deed was made subject to certain conditions, restrictions, and limitations found in 19 distinct articles. The first of these authorized the holders of two-thirds in amount of the outstanding bonds, at a properly called meeting, to take charge of, and thereafter control and manage, the sale of all lands then undisposed of. By this same article managers and agents could be appointed at such meeting, who should fix and determine the price per acre and the terms of sale. By means of another article the plaintiff, until some default was made in the conditions of the deed, or until the bondholders assumed control in the manner before mentioned, retained the control, sale, and management of the lands. Prices and terms of sale were to be prescribed by it, subject, however, to approval by the trustees, Rice and Drake, or their successors. It was further provided that all moneys derived from any sale of land should be deposited with the trustees, or with such company or bank as the trustees should designate, and be paid out by them, *first,* in the payment of such expenses as might be incurred in obtaining patents and titles to the lands; *second,* all public charges and taxes, (the lands in Iowa had not been exempted from general taxation;) and, *third,* such reasonable expenses as might arise in the management of the trust, including necessary disbursements in behalf of the bondholders. Exhibits of these expenditures were to be made to the plaintiff at least once a year, and to the bondholders, if they had assumed charge as provided in article 1; but no payments for the personal services of the trustees were to be made unless first authorized by the plaintiff or by the representatives of the bondholders, or by a proper court, whichever, for the time being, might have control and management of the subject of the trust, or of the funds arising from the sales. And whenever the trustees had accumulated funds sufficient to pay at least 4 per cent. interest upon all outstanding bonds, notice was to be given, and the proper interest coupons redeemed. There was also a provision for the extinguishment of the principal of the bonds at such times as the trustees might have at least $5,000 on hand, in addition to such amount as might be needed to satisfy all original interest coupons. On payment these bonds were to be cancelled and destroyed. Article 13 enabled the holders of the bonds

to convert them into such of these lands as might be at the time "free lands,"—that is, such as had not been bargained or sold, or contracted to be sold, through any particular agency, or in any particular manner, or set apart or used for a town-site or for depot purposes; the term "free lands" applying to such lands only as were for general sale at the plaintiff's office. These lands were not to be appraised for this purpose until title thereto was acquired,—that is, as the road was built,—and then by the plaintiff, the trustees concurring. The values so fixed were to be designated as the "current, appraised, sale value" of the lands, and at which the bondholders might buy, paying in bonds at their face, excluding all interest which might be due thereon. Provision was also made for a modification or change of the terms of the deed when the plaintiff and the trustees should deem it advisable, upon the concurrence of three-fourths in amount of the holders of the outstanding bonds. The same parties were empowered, after January 1, 1882, to take steps to close the trust, pay all remaining bonds, or to distribute *pro rata* among the holders such property or assets as might be on hand. It was also stipulated that, if the plaintiff failed at any time to properly perform its agreement as covenanted in the deed, the trustees might apply to any competent court to enforce the provisions found therein, granting to such court full power and authority to make all orders and judgments necessary to enforce, as well as to protect, the rights of all parties. In the concluding article we find it agreed that whenever all bonds and the interest thereon shall have been paid, together with the proper expenses of the trust, or whenever there shall be in the hands of the trustees cash or obligations arising from sales sufficient to pay all outstanding bonds, with interest and expenses, the trust-deed shall be void as to all remaining lands, and such, with all excess in money or obligations, shall revert to the plaintiff.

The bondholders have never availed themselves of the authority to assume control, conferred by article 1, but the lands have at all times been controlled, appraised, and sold by the plaintiff. There remains in all about 108,721 acres unsold, which are found by the court to have been worth not to exceed $4 per acre when the trust-deed was executed. There also remains unsold town lots of the value of $190,-

000. With these findings as to values the plaintiff expresses its dissatisfaction, alleging the findings to be erroneous, and in part unsupported by the evidence. On this point we can say that there is sufficient proof to sustain the court, although plaintiff's testimony, in the main, including proof of actual sales in large quantities, indicates the property to have been worth much more, and upon the trial some of defendant's witnesses fixed a greater value upon it than that found.

In determining the case much reliance seems to have been placed by the trial court upon its findings as to the value of these lands. In the deed the number of acres was stated to be not less than 555,000, but all lands embraced in the grant were expressly mentioned. A large quantity (about 87,000 acres) were not included in the estimate made in the deed, because of the uncertainty attending their ultimate disposal. It might be wise and prudent to exclude these disputed tracts from any consideration when preparing a recital for the deed, but the fact that this was done, of itself, and standing alone, should not deprive the plaintiff of the benefits of its contention that it was justified in and did somewhat rely upon securing an additional body of land awarded to another company after much litigation. It is manifest that plaintiff's claim was not without merit, for the state of Iowa recognized it by issuing a proper certificate of conveyance, and the contest was only settled by resorting to the highest tribunal in the land. The value of the lands conveyed was declared to have been $4 per acre at the time the deed was executed. There was a further finding in this connection to the effect that it was then reasonably expected that upon the completion of the contemplated railway this value would be increased $1 per acre. We have carefully examined the paper book to discover the testimony upon which this finding as to an enhanced value was based, but without success. All of the witnesses testify as to real values in 1871 and later, but none, so far as we are advised, as to what was or might have been expected by reason of the construction of the road. There could have been no doubt but that by the building of 74 miles, thus connecting the lines already in operation on the north and south, values would greatly appreciate, and this was considered, undoubtedly, by those who is-

sued as well as by those who purchased the bonds. As their worth depended upon and was measured by a speedy and proper use of the money thereby obtained, upon the value of the landed security and not upon the corporative liability of plaintiff, it would be proper and natural for all interested to estimate and judge both bonds and lands with a completely equipped and operated road, with station-houses located upon reservations provided for in the trust-deed, around which, on lands held by the trustees, flourishing towns and villages might be expected, all adding to the general prosperity and values as they then existed.

As heretofore remarked, the true character of this transaction must be gathered, and we are confined, aside from the matter of value, to an examination of the provisions of the instrument in question, many of which are unlike those considered in the past, in connection with the fact that plaintiff took upon itself no liability when issuing the bonds, except that imposed by its covenant to faithfully perform certain duties in regard to the security. It was this fact, among others, which led the court below into holding that article 19, which relates to and provides for moneys and lands in excess, should there be any, and that they shall revert to plaintiff, was inserted in the deed as a mere form, and without an expectation that the article would ever be utilized. Another matter which seems to have had weight with the court was its conclusion that the authority conferred on the holders of the bonds by articles 1 and 2 was absolute and uncontrollable. The extent of the power granted, or rights acquired, by this instrument is not to be determined by an inspection of one or more of its provisions, without reference to what may be elsewhere discovered. If it was a mortgage in fact, it could be so declared, and any of the parties compelled to treat and consider it as such. Even if the agreement had been that the bondholders might appropriate the security in payment of their bonds, this, in itself, would not give the conveyance the legal import of an absolute and unqualified alienation of the land. *St. Paul & Sioux City R. Co.* v. *McDonald*, 34 Minn. 182, (25 N. W. Rep. 57.) It will be noticed that in this case, unlike the one just referred to, there could have been no appropriation of the lands in satisfaction of the indebtedness. The right to acquire a cer-

tain part was absolutely prohibited. They must necessarily be purchased with money. Bonds could only be used after title was perfected, in payment of the so-called "free lands," at a "current, appraised, sale value," to be first determined by the plaintiff and then concurred in by the trustees. Because of the restrictions imposed by the deed as to the method in which the bonds could be placed as payment, the sections providing therefor were of little practical value. Again, by the terms of these articles, the holders of the bonds could in no event do more than to take control of and sell the lands in the manner prescribed for the guidance of the plaintiff. Their method of proceeding would have been the same, including the disbursement of the funds. Had the bondholders exercised the power and assumed control, there would have been nothing but a change of management. By taking such a step the holders of the bonds would have obtained no privileges or advantages whatever. The duty assumed by the plaintiff to discreetly manage the trust property, to judiciously convert it into cash, and to pay this out in strict accordance with the provisions of the deed, would have been simply shifted to the bondholders.

Taking the instrument as a whole, in connection with the circumstances, the condition and value of the land, and the situation of the parties, especially the fact that the bonds were intended for sale, and were actually sold, in the markets of the world, to many persons who at no time were interested in plaintiff's road, and who took no part in this transaction before they invested in the securities, we are not prepared to say with the trial court that this transaction was a scheme or device whereby the legal title to the land grant was to be retained by the plaintiff, while the estate and all interest therein passed to those who might thereafter buy the bonds. Nor can we say, upon the testimony, that the plain provisions of the trust-deed, in which a surplus is provided for, should be characterized and pronounced merely formal, inserted without expectation or belief that they would become effective, —in other words, with intent to evade taxation. We are of the opinion that the transaction, as made to appear by the testimony before us, did not amount to a conveyance of the lands, within the provisions of Laws 1865, *c.* 15, and that they are not taxable under section 5 of that chapter.

As the other question presented has been disposed of in *St. Paul & Sioux City R. Co.* against these defendants, *supra,* p. 394, the judgment appealed from is reversed, and it is further ordered that judgment be entered below as demanded in the complaint.

NOTE. In the case of *Sioux City & St. Paul R. Co.* v. *William V. King et al.,* the defendants being the auditor, treasurer and board of county commissioners of Jackson county, the same questions were presented as in the foregoing case, and the same decision made.